[Cite as *State v. Parsons*, 2015-Ohio-5103.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | Hon. Patricia A. Delaney, J. |
| | Hon. Craig R. Baldwin, J. |
| -vs- | |
| | Case No. 14-CA-63 |
| BRANDON PARSONS | |
| Defendant-Appellant | O P I N I O N |


| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Fairfield County Court of Common Pleas, Case Nos. 14-CR-178 and 14-CR-295 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | December 7, 2015 |


APPEARANCES:

| | |
|---|---|
| For Plaintiff-Appellee | For Defendant-Appellant |
| GREGG MARX | SCOTT P. WOOD |
| Prosecuting Attorney | Dagger, Johnston, Miller, |
| | Ogilvie & Hampson |
| By: ANDREA K. GREEN | 144 East Main Street |
| Assistant Prosecuting Attorney | P.O. Box 667 |
| Fairfield County, Ohio | Lancaster, Ohio 43130 |
| 239 W. Main Street, Ste 101 | |
| Lancaster, Ohio 43130 | |

*Hoffman, P.J.*

{¶1} Defendant-appellant Brandon Parsons appeals the July 28, 2014 Judgment Entry entered by the Fairfield County Court of Common Pleas denying his motion to suppress and his subsequent conviction and sentence. Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2} On March 28, 2014, the Lancaster Police Department was dispatched to 1213 N. Columbus St., Lancaster, Ohio after two separate 911 calls. The first caller reported witnessing a man chase after a woman. The caller stated a woman was screaming "Call 911!" and could be heard beating on an upstairs residence door.

{¶3} The second caller identified himself as Jason Sisson, an upstairs neighbor of Appellant. He reported Appellant's girlfriend, J.H., had run upstairs to his apartment and banged on the door to be let inside. Sisson reported to the 911 operator, after he let J.H. inside the apartment and locked the outside door, J.H. asked Sisson to call 911. Sisson stated J.H. entered his residence and went to the bathroom, where she locked herself inside. Appellant then proceeded to break through the outer door and progressed to the locked bathroom door, which he broke down. Sisson reported Appellant retrieved J.H. from the bathroom and pulled her back down the stairs to the lower residence.

{¶4} Officer Dotson of the Lancaster Police Department was the first to arrive on the scene. He testified at the suppression hearing he responded to a call of a female being dragged from a downstairs "apartment-like duplex". Upon arriving at the scene, he observed a female at a doorway of a residence, about 50 yards away, calling for a dog. She appeared to see the officer, and then turned to go back inside. When Officer Dotson

saw her, he was approximately 50 yards away. It was dark outside, and the officer could not see her face clearly. He was unable to tell anything about her demeanor or condition. He indicated it was dark, the residence was a duplex, so he was unsure to which door he was responding. He could not see the person's face, but could tell by her voice it was a female. When Officer Dotson knocked on the door to the residence and attempted to make contact, the occupants of the apartment did not respond. Officer Dotson testified he did not know whether the woman was the victim of the 911 call, and he was unable to tell whether she was in need of assistance.

{¶5} At the same time, Officer Spiegel of the Lancaster Police Department contacted Jason Sisson, who resided in the upstairs apartment and was the individual who made the 911 call. Sisson told Officer Spiegel J.H. had run up the stairs, banged on the door, and screamed for help. She screamed, "He's going to get me, he's right behind me!" and ran into the bathroom, closing the door. Sisson locked the outer door, and Appellant, who was running behind J.H., forced his way into the apartment. Appellant ran into the bathroom, smashed the door off the hinges, and dragged J.H. out of the apartment. Officer Spiegel observed the outer door and the double panes of glass on the front door of Sisson's apartment had been smashed. Further, Officer Spiegel observed the damage to the door jamb of Sisson's bathroom door leaning against the wall, and observed the same was completely ripped from the hinges.

{¶6} After speaking with Sisson, Officer Spiegel went back downstairs and spoke with another neighbor, who reported he observed J.H. screaming around the front of her apartment and up the stairs of Sisson's apartment. He then observed Appellant dragging

J.H. down the stairs into the downstairs apartment, prior to calling 911. Officer Spiegel relayed this information to the other officers on the scene.

{¶7} The officers determined the residence was in fact the residence where the female had been observed standing in the entrance. They knocked on the door and received no response. The only noise inside the apartment was the sound of a dog barking. The officers determined it was necessary due to emergency circumstances to make entry into the home without first obtaining a warrant.

{¶8} Once inside the residence, the officers located J.H. behind a door to the bedroom and Appellant lying on the floor to the same room. Both were uncooperative and told the officers to leave. Appellant assumed a defensive, combative, posture, and would not "stand down". After a warning from the officers, Appellant was subdued with a laser gun.

{¶9} In 2014CR0178, Appellant was arrested, and indicted on one count of burglary, in violation of R.C. 2911.12(A) and (D); one count of trespass in a habitation, in violation of R.C. 2911.12(B) and (E).

{¶10} On May 28, 2014, Appellant filed a motion to suppress. The State filed a memorandum contra the motion to suppress on July 10, 2014. The trial court conducted a hearing on the motion on July 14, 2014.

{¶11} On July 18, 2014, in Case No. 2014CR0295, Appellant was indicted on one count of burglary, in violation of R.C. 2911.12(A)(2) and (D); one count of abduction, in violation of R.C. 2905.02(A)(1) and (C); one count of trespass in a habitation, in violation of R.C. 2911.12(B) and (E); and one count of domestic violence, of a family or household member, in violation of R.C. 2919.25(A), (D)(2).

**{¶12}** On July 28, 2014, the state filed a Post-Hearing Brief Contra Appellant's Motion to Suppress.

**{¶13}** Via Judgment Entry of July 28, 2014, the trial court overruled Appellant motion to suppress.

**{¶14}** Following a jury trial on July 31, 2014 in Case No. 2014CR0178, Appellant was found guilty of the burglary and trespass charges. The trial court found the offenses to be allied offenses of similar import and sentenced Appellant to a term of three years on the burglary charge.

**{¶15}** In Case No. 2014CR00295, following a trial to the court on Count Two, abduction and Count Four, domestic violence, the trial court, via Verdict of November 10, 2014, found  Appellant guilty of the charge of abduction and not guilty of the charge of domestic violence.

**{¶16}** On November 12, 2014, the trial court sentenced Appellant to one year in prison on Case No. 2014CR0295, consecutive to Case No. 2014CR0178, but suspended the sentence in lieu of the imposition of community control.

**{¶17}** Appellant appeals, assigning as error:

**{¶18}** "I. THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS.

**{¶19}** "II. THE TRIAL COURT ERRED IN SENTENCING APPELLANT."

I.

**{¶20}** Appellant assigns as error the trial court's denial of his motion to suppress.

**{¶21}** There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In

reviewing a challenge of this nature, an appellate court must determine whether the findings of fact are against the manifest weight of the evidence. See: *State v. Fanning (1982),* 1 Ohio St.3d 19, 437 N.E.2d 583; *State v. Klein (1991),* 73 Ohio App.3d 486, 597 N.E.2d 1141; *State v. Guysinger (1993),* 86 Ohio App.3d 592, 621 N.E.2d 726.

**{¶22}** Secondly, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. See: *State v. Williams* (1993), 86 Ohio App.3d 37, 619 N.E.2d 1141.

**{¶23}** Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry (1994),* 95 Ohio App.3d 93, 96, 641 N.E.2d 1172; *State v. Claytor (1993),* 85 Ohio App.3d 623, 627, 620 N.E.2d 906; and *State v. Guysinger (1993),* 86 Ohio App.3d 592, 621 N.E.2d 726. As the United States Supreme Court held in *Ornelas v. U.S. (1996),* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911, "... as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal."

**{¶24}** At the suppression hearing, Officer Dotson testified he was the first to arrive on the scene on March 28, 2014. Dispatchers put out a call of a domestic disturbance between a man and a woman indicating a man had chased a woman into an upstairs apartment, forced his way in, and drug her out forcibly removing her back to an apartment.

**{¶25}** Officer Dotson testified at the July 14, 2014 suppression hearing,

[OFFICER DOTSON:]

The layout is kind of interesting. The road is lower than all the houses. The houses kind of sit up on a hill and it's set back a little bit from the road.

As I was walking up to the house, I could see a female at a doorway and there was a bunch of dogs kind of running around in the driveway. The driveway was shared, so it was kind of a bigger driveway.

I couldn't tell who she was. I could just tell it was a female at the door and by her voice.

As I approached, when I believe she saw me, she turned around and went into the house. I wasn't even able to talk to her or call her name.

Q. About how far away from her were you?

A. I'd say, about 50 yards.

Q. Were you able to see her face clearly?

A. No.

Q. Was it dark?

A. Yes.

Q. Could you tell her demeanor?

A. No.

Q. How quickly did she go inside?

A. I don't even know if she was - - I don't know how quickly. She just kind of turned and walked right back in, shut the door.

Q. When you went up there, did you know which residence you were responding to?

A. Not exactly, no. I knew it was an apartment duplex and that was the one that appeared to be so. And not until I got up to it was I able to see clearly the address.

Q. What happened next?

A. We attempted to make contact. I was knocking on the front door. I was attempting to look in the windows. No one was answering.

And then a few other officers arrived. They were trying to make contact to the rear entrance. I pretty much stayed more around the front. All the other officers were out back. And we didn't get an answer.

Q. Now, the residence that you saw this female go into, is that the residence you're referring to?

A. Yes.

Q. So you saw her going in there. And contact was attempted to be made?

A. Yes.

Q. And was that successful at any point in time?

A. No.

Q. How were you trying to make contact?

A. We were knocking on the front door, the back door. We were yelling, 'Police. Come to the door.' I think we were knocking on some windows.

Q. For how long did you do that?

A. I'd say it was at least ten minutes.

Q. Were you able to see anyone in the residence?

A. I was not able to see anyone.

Q. Did you hear any sounds coming from the residence?

A. No.

Q. Did you learn any additional information while you were there?

A. I didn't speak to anybody.  I was overhearing traffic on the radio. I was told that a neighbor - - the upstairs neighbor actually was familiar with them.

He saw Brandon come in the house - - well, the female that came in the house was asking for help and Brandon came in, broke the door, the front door window and bathroom door, and took her, and took her downstairs.

Tr at 27-31.

{¶26}  Officer Spiegel then relayed the information he learned from Jason Sisson and the other neighbor witness to the responding officers.  A determination was made to enter the residence without a warrant due to the exigent circumstances.

{¶27}  Officer Dotson testified at the suppression hearing,

Q. And was a decision made?

A. Yes.  We found the front - - I think it was a screened-in room.  That door was unlocked, and there was a second door that was unlocked that we went in, which was the main entrance to the house.

Q. You didn't have to kick the door in?

A. No.

Q. Did you have a warrant at this time?

A. No.

Q. Did you - - why didn't you obtain one?

A. With the information we had, we believed that it was in the best interests of everyone's safety that we make entrance. We were unsure if anyone was harmed in the altercation or was going to be harmed.

Q. Before you made entrance, did you have that additional information from the other neighbors?

A. Before we made - - yes, yes. They were - - they communicated to, I think, Officer Spiegel.

Q. When you made entrance, did you locate anyone?

A. Yes.

Q. Who did you locate?

A. Brandon was lying on the floor in the bedroom and she was behind the door in that same room.

* * *

On Cross Examination,

Q. Didn't you hear her exclaim that you didn't have a warrant and could not come in? Didn't you hear her say that?

A. Yes.

THE COURT: Was that a yes?

OFFICER DOTSON: Yes, sir.

MR. WOOD: That's all the questions I have, Your Honor.  Thank you.

On Redirect Officer Dotson's testimony continued.

Q. When you did hear [J.H.] say, 'You don't have a warrant.  You can't come in,' had you made entry at that time?

A. Yes.

Q. And you would have been trying to make contact for, you said, ten minutes prior to that?

A. At least.

Q. And had you heard - - had any contact from the residents before that?

A. No.

Q. So she didn't say, 'You can't come in.  You don't have a warrant' before you made entrance?

A. No.

Q. On what basis did you make the entrance?

A. We feared for their safety - - her safety.

Q. Why?

A. Before the call came in and the neighbors stated that she was calling for help and was being drug off by a man and believed that they were in the apartment.

Q. You did - - you said you did see a woman.

A. Yes.

Q. And you said that it turned out to be that same residence; correct?

A. Yes.

Q. So why didn't that change your assessment?

A. I did not know that was the same female that was in trouble. I didn't know how many people were in the house.

Q. Would it have changed your assessment if you knew that was the same woman?

A. No.

Q. Why not?

A. I wasn't close enough to her. I don't know why she was running in. There was no - - I didn't have long enough dealings with her to even be able to figure out if it was - - you know, that she needed help or she did not need help.

Tr. at 31-42.

**{¶28}** Following the denial of Appellant's motion to suppress, a jury trial was conducted on the charges in 2014 CR 0178, and a trial to the court took place on the Counts Two and Four in 2014 CR 00295. J.H. testified as to the events of the incident in both proceedings, including observing Officer Dotson approach the house, closing the door, and refusing to answer the door while the police were knocking.

**{¶29}** In addition to J.H.'s testimony, Officer Dotson testified at trial,

Q. And why did you feel it was necessary to enter the residence?

A. For the safety of whoever was drug into the house.

Q. And you had been unable to make contact with anyone in the house up until that point?

A. Correct.

* * *

Q. Now, when you - - did you, in fact, enter the apartment?

A. Yes.

Q. And where did you go?

A. The first part is kind of like, I guess, a foyer room. It's got a screen door that's enclosed. And then the next door actually went in to the living quarters of the home. That first part was like the living room area. Off to the left was a bedroom, and if you kept going to the right was a kitchen/dining room area. And then right in front of you was another door that was closed.

I went to that first, as the other officer checked the other area. As I pushed that door open, that's where I found Brandon Parsons and Jenna.

Q. Was anyone else in that room?

A. And Jenna.

Q. And where were they both located in the room?

A. Brandon was lying on the floor directly in front of the door. He was on his back, his head towards the doorway.

And Jenna was behind the door as it closed up against the wall.

* * *

Q. Okay. Now, what happened when you pushed the door open?

A. I first saw Brandon lying there and I came - - I started to enter the doorway. And as I paused the door, I felt some give-back, and I could tell that it was a person and not just objects.

Q. And what happened next?

A. We ordered Jenna up and tried to get her out from behind the door. And we ordered Brandon to his knees.

They began shouting at us saying that we didn't have a warrant to enter, that it was illegal. And - - -

Q. Now, let's focus on the Defendant. What was his demeanor like? How was he acting?

A. He was very hostile towards us. He was uncooperative. He refused to obey our orders. As we kept ordering him to his knees, he'd stand up. He was kind of posturing. And what I mean by posturing, it's kind of - - his intimidating stance as if he was either to fight or, you know, kind of stand his ground. And just, in general, refusing orders from us.

Q. And what happened at that time?

A. I was able to pull Jenna from around the door, and I passed her off to another officer. And as I turned around, Officer Finan and Brandon were engaged in a confrontation. Officer Finan and myself were both ordering him back to his knees. At this point, Brandon is directly in the doorway. They're both in the door. And Officer Finan warned him that he was going to tase him. Brandon didn't heed any of the warnings and pretty much said that, 'Go ahead and tase me.'

Q. And was he tased at that time?

A. Yes.

Q. Now, eventually, was the Defendant - - what happened with the Defendant next?

A. He was tased. He was shot with the taser. It brought him to the ground. We were right in the doorway and we kind of moved around him and we cuffed him.

Q. Was he removed from the apartment after that?

A. Yes. We stood him up and removed him from the apartment right away.

* * *

Q. And did you speak with her?

A. Yes.

Q. What was her demeanor like?

A. She was uncooperative. She was not wanting us there at all.

Q. Did you have an opportunity to be within a couple of feet of her at any point?

A. Yes.

Q. Were you able to observe anything about her physical appearance?

A. Her face was very red, kind of puffy as if she had been crying. She had dried blood around her lips.

Q. Now, did you include information about these observations of her physical appearance in your report?

A. No.

Q. Why not?

A. I don't know.

Q. Was she willing to talk about anything that had happened that night, without saying what she said?

A. No.

Tr. at 102-107.

**{¶30}** Based upon totality of the facts and circumstances presented herein, we find the trial court did not err in denying Appellant's motion to suppress herein.

**{¶31}** The first assignment of error is overruled.

II.

**{¶32}** In the second assignment of error, Appellant appeals his sentence imposed by the trial court. Specifically, Appellant argues his sentence for burglary and his sentence for abduction are allied offenses of similar import; therefore, should merge for the purposes of sentencing. We disagree.

**{¶33}** Revised Code, Section 2941.25 reads,

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶34}** In *State v. Johnson,* 128 Ohio St.3d 153, 942 N.E.2d 1061, 2010–Ohio–6314, the Ohio Supreme Court held,

Under R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct. Thus, the court need not perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger.

In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other. *Blankenship,* 38 Ohio St.3d at 119, 526 N.E.2d 816 (Whiteside, J., concurring) ("It is not necessary that both crimes are always committed by the same conduct but, rather, it is sufficient if both offenses *can be* committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both offenses." [Emphasis sic]). If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." *Brown,* 119 Ohio St.3d 447, 2008–Ohio–4569, 895 N.E.2d 149, at ¶ 50 (Lanzinger, J., dissenting).

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

{¶35} Recently, the Ohio Supreme Court in *State v. Ruff,* 2015–Ohio–995, 143 Ohio St.3d 114, addressed the issue of allied offenses, determining the analysis set forth in *Johnson* to be incomplete. The Court in *Ruff,* held,

When the defendant's conduct constitutes a single offense, the defendant may be convicted and punished only for that offense. When the conduct supports more than one offense, however, a court must conduct an analysis of allied offenses of similar import to determine whether the offenses merge or whether the defendant may be convicted of separate offenses. R.C. 2941.25(B).

A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant.

In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, and (3) the offenses were committed with separate animus or motivation.

At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense. We therefore hold that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

**{¶36}** Here, Appellant was convicted of Burglary, in violation of R.C. 2911.12(A) and (D), which read,

(A) No person, by force, stealth, or deception, shall do any of the following:

(1) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense;

(2) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense;

(3) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, with purpose to commit in the structure or separately secured or separately occupied portion of the structure any criminal offense.

**{¶37}** ***

(D) Whoever violates division (A) of this section is guilty of burglary. A violation of division (A)(1) or (2) of this section is a felony of the second degree. A violation of division (A)(3) of this section is a felony of the third degree.

**{¶38}** Appellant was also convicted of Abduction, in violation of R.C. 2905.02(A)(1) and (C), which reads,

(A) No person, without privilege to do so, shall knowingly do any of the following:

(1) By force or threat, remove another from the place where the other person is found;

\*\*\*

(C) Whoever violates this section is guilty of abduction. A violation of division (A)(1) or (2) of this section or a violation of division (B) of this section involving conduct of the type described in division (A)(1) or (2) of this section is a felony of the third degree. A violation of division (A)(3) of this section or a violation of division (B) of this section involving conduct of the type described in division (A)(3) of this section is a felony of the second degree. If the offender in any case also is convicted of or pleads guilty to a specification as described in section 2941.1422 of the Revised Code that was

{¶39} Appellant maintains he entered his neighbor's apartment for the sole purpose of physically retrieving his girlfriend. Appellant maintains the restraint of J.H. was merely incidental to the underlying crime of burglary. Appellant broke in through the outside door of the apartment, proceeded to the bathroom door and broke down the same, retrieved J.H. and drug her out of the apartment.

{¶40} We find the harm caused to Sisson is separate and distinct from the harm caused to J.H. The offenses involved separate and distinct victims. We find the trial court did not err in sentencing Appellant.

{¶41} Appellant's second assignment of error is overruled.

{¶42} The July 28, 2014 Judgment Entry denying Appellant's motion to suppress and Appellant's conviction and sentence entered by the Fairfield County Court of Common Pleas are affirmed.

By: Hoffman, P.J.

Delaney, J.  and

Baldwin, J. concur